MOORE *v.* MONCUS.

Equity—Contracts—Oral Agreement—Meetings of Minds.

> Decree establishing an equitable lien upon property, title to which was taken in name of defendants with consideration furnished by plaintiff, is affirmed, where record shows that plaintiff, recently widowed, was to live with her sister and husband in house purchased, but it appears that the minds of the parties never met upon all of the terms of the proposed written agreement and the oral agreement was not sufficient to determine the rights and duties of the parties.

Appeal from Wayne; Fitzgerald (Neal), J. Submitted January 11, 1956. (Docket No. 68, Calendar No. 46,601.) Decided March 1, 1956.

Bill by Annabelle F. Moore against Lamar Moncus and Pauline V. Moncus to establish equitable lien on real estate. Decree for plaintiffs. Defendants appeal. Affirmed.

*John P. O'Hara, Jr.,* for plaintiff.

*Ira F. Morgan,* for defendants.

Sharpe, J. This is an action to establish an equitable lien upon a parcel of real estate in the city of Detroit, Michigan. The facts necessary to decision

References for Points in Headnote

33 Am Jur, Liens § 22.
Rights and remedies of one who advances money to purchase real estate under an oral agreement by the vendee to give a mortgage thereon as security. 18 ALR 1098.

are as follows: Plaintiff, Annabelle F. Moore and defendant, Pauline V. Moncus, are sisters. Defendant, Lamar Moncus, is the husband of Pauline V. Moncus. Plaintiff, recently widowed and not desiring to live alone in the home she and her late husband occupied, proposed that she and defendants live together. At this time plaintiff offered to make the down payment on a house in the amount of approximately $3,500, in return for which she was to receive her board and room. Up to this time defendants did not own a home and were renting a house at a rental of $50 per month. The parties looked at several houses and finally selected a house on Houston avenue, Detroit, Michigan, the purchase price of which was $12,500. Prepaid taxes, costs, and insurance brought the purchase price to $12,-688.98. In order to complete the purchase plaintiff advanced the sum of $5,586.41, which paid the equity of the owners down to the existing mortgage. This down payment was approximately $2,000 more than plaintiff originally expected to pay. Title to the premises was taken in the name of defendants. The parties moved into the home on or about March 1, 1953. It was also a part of the preliminary agreement that a written agreement would be executed, but this was never accomplished. It also appears that during the preliminary stage of the agreement plaintiff insisted that Mrs. Moncus was to keep the house clean, which Mrs. Moncus agreed to do.

On or about August 12, 1953, friction developed between the parties because plaintiff felt that defendants were not living up to a promise to keep the house in a good, livable condition, and because at times Mr. Moncus would not speak to plaintiff. Soon after the above date plaintiff moved out of the house. About September 23, 1953, plaintiff received a check for $40 from defendant Pauline Moncus with a statement on it, "1st payment on loan."

It also appears that plaintiff was employed on the night shift in a factory; that Mrs. Moncus was employed during the day at a hospital; that Mr. Moncus sometimes worked part day and part night, and that defendants' daughter, who was living in the home, was also employed.

When the cause came on for trial, plaintiff testified:

"*Q.* What was the condition of the home that required you to take care of it?

"*A.* Well, there were dishes in the sink when I would come home from work at night, and in the morning when I would get up; shoes under the table in the kitchen, and sometimes they were on it; there was dust everywhere, and dirt. In the bathroom there were clothes hanging in there. Mrs. Moncus did not take care of these things, pick them up. I spoke to her constantly about taking care of it. She said: 'You have all day before you go to work to do things, and I am tired when I come home at night.' I said, 'What is the difference; we both work the same. I have to work after I leave here.' As the result of my request she would do something once in a while to take care of these things. * * *

"*A.* I said to Mrs. Stoll,—that is my cousin: 'If something were to happen to Mrs. Moncus I wouldn't have anything. I would be out.' She said: 'Well, we will draw up something.' Mr. and Mrs. Moncus agreed to it, both of them, that something would be drawn up, whereas if something would happen to her, that I would have something to show that I had put that money on the house."

Defendant, Pauline V. Moncus, testifying in her own behalf, stated:

"*Q.* Is it a fact that a cousin of yours was to draw papers after you moved in?

"*A.* Yes.

"*Q.* Was there any discussion between you as to what would happen if you and Mr. Moncus were to die?

"*A.* Yes. When Mrs. Stoll came to talk to Mrs. Moore about her will that subject was brought up; and Mrs. Stoll was requested to draw up some papers whereby Mrs. Moore would have an interest in the house; so that if anything ever happened to her, or to Mr. Moncus and I, it could not be taken away from her, her interest; so that she would have an interest in the house. Mrs. Stoll did not get around to it; and some time around the middle of August, after Mrs. Moore first asked us to move, I called Mrs. Stoll and told her just to drop the matter."

The trial court, after hearing the above and other testimony, entered a decree in favor of plaintiff, and in an opinion stated:

"It was obvious from the testimony that the plaintiff's claim, with no better basis than shown, would not be grounds for relief in an ordinary case. However, the personal element in this case is so important that the court deems it necessary to send the parties on their separate ways with an equitable distribution of the assets involved. The court does not feel that it is right or proper to force these people to live together, even though their differences are more personal than legal in nature."

Defendants appeal and urge that plaintiff failed to establish a case for equitable rescission, and that a court of equity is powerless to make a new contract for the parties.

Plaintiff urges that the parties did not make a legal and binding contract, and assuming such a contract was made, a court of equity was justified in rescinding the same and making an equitable settlement between the parties.

In *Swart* v. *Western Union Telegraph Co.,* 142 Mich 21, plaintiffs brought an action at law to recover

rent. The facts are as follows: Plaintiffs were the proprietors of a hotel. They entered into verbal negotiations for a lease to the defendant for room in the hotel for a telegraph office. Plaintiffs offered to lease space for 5 years at an annual rental of $1,800 and $40 per month for franking privileges. Defendant's agent telegraphed the New York office of defendant for confirmation. The offer was approved and defendant took possession March 1, 1901, and occupied the room until July 31, 1901. It was agreed that a written lease should be executed. Each party prepared a lease, but neither lease was signed. The disagreement between the parties arose over the extent of the franking privileges and the hours during which the office should be kept open. We there said (p 23):

"No claim is made by plaintiffs that any written lease was executed. They claim that there was a parol lease for 5 years, void under the statute of frauds, but valid for a year, and seek to recover for 7 months' rent. The court held that no verbal lease had been agreed upon, and that, therefore, the defendant was a tenant at sufferance or at will, and that, the rent being payable monthly, plaintiffs were entitled to 1 month's rent, and judgment was entered for that amount. The plaintiffs have appealed.

"It is clear that the verbal negotiations did not embody all the terms of the proposed lease, nor was it contemplated that they should. In the cases upon which plaintiffs' counsel rely there was no doubt that a parol lease had been agreed upon. The jury and the court were able to definitely establish their terms. See *Huntington* v. *Parkhurst*, 87 Mich 38 (24 Am St Rep 146). It was not enough to constitute a lease that the term rent and time of payment were agreed upon, if the other provisions were contemplated upon which they had not agreed. The court, therefore, correctly held that the minds of the parties had never met, and that there was no parol lease by

which their rights could be determined. The tenancy was one at will, terminable upon a month's notice. *Huyser* v. *Chase,* 13 Mich 98; *McIntosh* v. *Hodges,* 110 Mich 319; *Barrett* v. *Cox,* 112 Mich 220."

In our opinion the principle involved in the above case is similar` to the issue involved in the case at bar. In the instant case there was no written agreement, nor were all the items of the proposed agreement agreed upon. It was clearly contemplated by all parties that a later agreement would be executed that would fully finalize the area of the agreement. We conclude that the minds of the parties had never met upon all the terms of the proposed agreement and that the verbal agreement was not sufficient to determine the rights and duties of the parties.

The decree of the trial court is affirmed, with costs to plaintiff.

DETHMERS, C. J., and SMITH, REID, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.